MARC J. FAGEL (CA Bar No. 154425)
JOHN S. YUN (yunj@sec.gov)
MARK P. FICKES (fickesm@sec.gov)
CAMERON P. HOFFMAN (hoffmanc@sec.gov)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2600
San Francisco, California 94104
Telephone: (415) 705-2500
Telecopy: (415) 705-2501

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>FRANCIS ELIAS AXIAQ, et al.<br><br>Defendants, | Civil Action No.<br>CV-08-4637-CRB<br><br>**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S TRIAL BRIEF**<br><br>Date: Oct. 5, 2009<br>Time: 8:30 a.m.<br>Judge: Charles R. Breyer<br>Courtroom: 8 |

# TABLE OF CONTENTS

INTRODUCTION .................................................................. 1

FACTUAL BACKGROUND ...................................................... 2

LEGAL ARGUMENT ............................................................. 7

    I.    AXIAQ'S INSIDER TRADING VIOLATED SECTION 10(b) AND RULE 10b-5 . 7

        A.    Rivor Breached a Fiduciary Duty By Tipping Information to the Axiaqs .... 8

        B.    Axiaq Violated Section 10(b) And Rule 10b-5 By Using Information That He Knows, Or Should Know, Was Provided In Breach Of A Fiduciary Duty .................................................. 9

        C.    Axiaq Knowingly Used Material Non-Public Information to Buy Stock ... 10

    II.    THE COURT SHOULD IMPOSE REMEDIAL RELIEF UPON AXIAQ ........ 12

        A.    Axiaq Should Disgorge His November 8, 2007 Stock Price Gains ........ 12

        B.    Civil Penalties Will Deter Similar Misconduct By Axiaq And Others ..... 13

        C.    A Permanent Injunction Is Necessary Given Axiaq's Lack of Remorse .... 14

CONCLUSION ................................................................... 15

TABLE OF AUTHORITIES

CASES

*Aaron v. SEC*, 446 U.S. 680 (1980) .................................................. 10

*Dirks v. SEC*, 463 U.S. 646, 103 S. Ct. 3255, 77 L. Ed 2d 911 (1983) ................ 8, 9, 11

*Hollinger v. Titan Capital Corp.*, 914 F.2d 1564 (9th Cir. 1990) ...................... 11

*In re Apple Computer Sec. Litig.*, 886 F.2d 1109 (9th Cir. 1989) ..................... 12

*Knapp v. Whinney*, 90 F.3d 1431 (9th Cir. 1996) ..................................... 13

*SEC v. Adler*, 137 F.3d 1325 (11th Cir. 1998) ..................................... 2, 12

*SEC v. Cassano*, 61 F. Supp. 2d 31 (S.D.N.Y. 1999) ................................ 2, 10

*SEC v. Dain Rauscher, Inc.*, 254 F.3d 852 (9th Cir. 2001) ........................... 11

*SEC v. Downe*, 969 F. Supp. 149 (S.D.N.Y. 1997) .................................. 2, 12

*SEC v. Falbo*, 14 F. Supp. 2d 508 (S.D.N.Y. 1998) .................................... 8

*SEC v. Fehn*, 97 F.3d 1276 (9th Cir. 1996) .......................................... 15

*SEC v. Ferrero*, 1993 WL 625964 (S.D. Ind. Nov. 15, 1993), *aff'd* 51 F.3d 623 (7th Cir. 1995) ... 9

*SEC v. First City Fin. Corp.*, 890 F.2d 1215 (D.C. Cir. 1989) ....................... 13

*SEC v. First Pacific Bankcorp.*, 142 F.3d 1186 (9th Cir. 1998) ...................... 13

*SEC v. Geon Industries, Inc.*, 531 F.2d 39 (2d Cir. 1976) ........................... 11

*SEC v. Ginsburg*, 362 F.3d 1292 (11th Cir. 2004) ................................ 11, 12

*SEC v. Ingram*, 694 F. Supp. 1437 (C.D. Cal. 1988) .................................. 11

*SEC v. Maio*, 51 F.3d 623 (7th Cir. 1995) ........................................... 12

*SEC v. Mayhew*, 121 F.3d 44 (2d Cir. 1997) .......................................... 11

*SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980) ........................................ 15

*SEC v. Musella*, 748 F. Supp. 1028 (S.D.N.Y. 1989) ............................... 9, 10

*SEC v. Patel*, 61 F.3d 137 (2d Cir. 1995) ........................................... 13

*SEC v. Soroosh*, 1997 WL 487434 (N.D. Cal. Aug. 5, 1997) ............................. 8

*SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968) ....................... 7, 13

*SEC v. Thrasher*, 152 F. Supp. 2d 291 (S.D.N.Y. 2001) ................................ 9

*United States v. Libera*, 989 F.2d 596 (2d Cir. 1993) ............................... 11


*United States v. O'Hagan*, 521 U.S. 642, 117 S. Ct. 2199, 138 L. Ed. 2d 724 (1997) ............ 7

*United States v. Smith*, 155 F.3d 1051 (9th Cir. 1998) ............................... 8, 11, 12

*United States v. Willis*, 737 F. Supp. 269 (S.D.N.Y. 1990) ............................... 8

STATUTES AND REGULATIONS

15 U.S.C. § 78j(b) ............................................................... 7

15 U.S.C. § 78u(d)(1) ........................................................... 14

15 U.S.C. § 78u(e) .............................................................. 14

15 U.S.C. § 78u-1(a)(2) ......................................................... 13

17 C.F.R. § 240.10b5-1(a) ........................................................ 8

17 C.F.R. § 240.10b5-1(b) ....................................................... 11

OTHER AUTHORITIES

H.R. Rep. No. 355 .............................................................. 14

# INTRODUCTION

By his own admission, defendant Francis Elias Axiaq ("Axiaq") learned in an October 24, 2007 telephone call from his son, former defendant Emmanuel Axiaq ("Emmanuel"), that Restoration Hardware, Inc. was going to be acquired soon at $6.50 per share. Axiaq also admits being told that the source of this buy-out information was former defendant Ciriaco "Eric" Rivor ("Rivor"), who was a friend of Emmanuel and who has previously tipped Axiaq about a still secret buy-out of the company that Emmanuel and Rivor were then working at, the Good Guys, Inc.

In the October 24th telephone call, Emmanuel told Axiaq that Rivor had said to buy Restoration Hardware stock, but limit the amount of his purchases – for the obvious purpose of avoiding detection of the illegal insider trading. Axiaq asked no questions regarding this tip, except for the ticker symbol of Restoration Hardware. Axiaq acknowledges that he subsequently purchased Restoration Hardware stock – using the information from Rivor and Emmanuel as a "factor" in his trading – while knowing that trading on inside information was illegal. These admissions establish all elements of Axiaq's liability for insider trading in Restoration Hardware common stock.

Besides his admissions, Axiaq's Restoration Hardware purchases after the October 24th tip further establish that he was consciously using material inside information from Rivor. On October 25, 2007, the day after the tip, Axiaq purchased Restoration Hardware shares for the first time ever. Just two business days later, on October 29, 2007, Axiaq told Timothy Mills ("Mills"), a TD Ameritrade Investments representative, to liquidate his profitable Amerivest IRA account so that he could buy Restoration Hardware stock with the proceeds.

Additionally, during the week of October 29 to November 2, 2007, Axiaq purchased 110,000 Restoration Hardware shares in his other accounts with approximately $340,000 of his retirement funds. The following week, on November 5, 6 and 7, 2007, Axiaq purchased another 64,000 shares of Restoration Hardware stock for another $340,000. Axiaq's therefore invested over 53% of his brokerage account holdings just before the company's acquisition was publicly announced on November 8, 2007. Axiaq's rapid and massive purchases of Restoration Hardware stock provide compelling evidence that he was trading on material information that Axiaq knew was given to him by a company insider in breach of his fiduciary duties; Axiaq's did not – as he is now trying to assert – purchase Restoration Hardware

stock based on mere rumors, an internet posting, or an attempt to dollar cost average his holdings. *E.g.*, *SEC v. Adler*, 137 F.3d 1325, 1340, 1343 (11th Cir. 1998) (timing of trades and telephone calls); *SEC v. Downe*, 969 F. Supp. 149, 154-55 (S.D.N.Y. 1997) (timing of events, conversations and trades establishes trading on inside information).

Axiaq's knowledge that he had illegally traded based upon inside information is reinforced by his patently false statements during a telephone interview with the Commission's staff. Axiaq falsely stated during the interview that he first learned about the acquisition of Restoration Hardware through the November 8th announcement and that he was "so surprised" by the announcement. Axiaq also concealed his relationship with Rivor during the interview when asked if he knew any Restoration Hardware employees. These efforts to conceal the tip and his familiarity with Rivor further demonstrate Axiaq's guilty knowledge regarding his insider trading in Restoration Hardware stock. *SEC v. Cassano*, 61 F. Supp. 2d 31, 34 (S.D.N.Y. 1999) (lying to "SEC investigators about the circumstances of the trades and/or their awareness of such trading by others evidences knowledge of guilt").

When added to Rivor's, Emmanuel's and Mills' trial testimony, the admissions, trading pattern and false statements of Axiaq will all point to only one liability determination: Axiaq violated Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act") by purchasing Restoration Hardware stock between October 25 and November 7, 2007 using material non-public information provided by an insider in breach of his fiduciary duties. Given Axiaq's liability for insider trading, the Court should order him to disgorge his ill-gotten gains of $881,102 plus prejudgment interest on that amount. The Court should impose a civil monetary penalty upon Axiaq to deter him and other persons from engaging in insider trading and should also issue a permanent injunction against Axiaq's further violations of Section 10(b) and Rule 10b-5.

**FACTUAL BACKGROUND**

During 2007, Restoration Hardware was a specialty retailer of household furniture and products based in Corte Madera, California. Restoration Hardware's common stock was quoted on the NASDAQ Global Exchange under the ticker symbol "RSTO".

Defendant Axiaq resides in Millbrae, California, and he retired as an electrician in the spring of 2007. His son, Emmanuel, lives in San Carlos, California and worked at the Good Guys from

1996 to 2005. When he left his employment with the Good Guys, Emmanuel held the position of a senior data warehouse manager.

Rivor was Vice President of Treasury in the finance department of Restoration Hardware during 2007. On or about August 27, 2007, the Chief Financial Officer of Restoration Hardware told Rivor about a potential acquisition of the company by a private equity firm. On August 28, 2007, Rivor signed an acknowledgment that he had received "material non-public information" about "Project Jefferson," which was the secret code name for the acquisition. Rivor agreed in the signed acknowledgment to treat as confidential the information that he received about the planned acquisition.

During Fall 2007, Restoration Hardware was providing due diligence for the still-secret potential acquisition. By the third week of October 2007, the potential acquisition had progressed to its final stages. During the third or fourth week of October 2007, Rivor reviewed a draft merger agreement, which contained the merger terms. He also spoke with the Chief Financial Officer about the timing of the public announcement of the acquisition of Restoration Hardware.

Rivor knew Emmanuel from their prior employment together at the Good Guys. They were "good friends" and "trading buddies." Rivor also knew Axiaq. Axiaq had assisted Rivor by performing electrical work on Rivor's home. Rivor wanted to "be a nice guy" and help Emmanuel make a little money, as well as to promote his own ego. On October 24, 2007, Rivor called Emmanuel to tip him about a forthcoming acquisition of Restoration Hardware. During the October 24, 2007 telephone call, Rivor told Emmanuel about the acquisition and said "buy some RSTO" because a buyout at a premium price of $6.50 per share would happen "soon." Rivor also cautioned Emmanuel to "stay under the radar" by buying less than 10,000 shares of Restoration Hardware stock.

Rivor told Emmanuel to pass the information about the acquisition to Emmanuel's father, Axiaq. Rivor told Emmanuel that Axiaq and Rivor had previously discussed an acquisition involving the Good Guys. Rivor instructed Emmanuel to tell Axiaq to buy Restoration Hardware stock, but to caution Axiaq to keep his purchases small to avoid detection.

Following his telephone conversation with Rivor, Emmanuel purchased 170 shares of Restoration Hardware stock on October 24, 2007. That same evening, Emmanuel called his father, Axiaq, and told him that Restoration Hardware is going to be bought out at 6.50 and that "Eric would like

to let you know." Emmanuel also expressly cautioned his father to limit the amount of stock he purchased.

When Axiaq received the tip, Axiaq knew that Rivor was a long time friend of his son, Emmanuel, and that Rivor held company positions which gave him access to nonpublic information about potential acquisitions. According to Axiaq, in approximately 2003, Rivor tipped Axiaq directly about a then still-secret acquisition of Good Guys. This tip occurred while Axiaq was doing some electrical work at Rivor's home. Axiaq has testified that he did not act on the Good Guys tip from Rivor because he knew that it would be wrong to trade on inside information and because he did not want to get Emmanuel into trouble while Emmanuel was working at the Good Guys..

With respect to the October 24th telephone call with Emmanuel regarding Restoration Hardware, Axiaq did not ask his son why Rivor suggested the purchase of Restoration Hardware stock or why he should limit the amount of stock he purchased. Axiaq only asked Emmanuel for Restoration Hardware's ticker symbol so he could locate it on the internet. After the October 24, 2007 call, Axiaq looked up Restoration Hardware on Yahoo Finance and saw no mention of a potential merger.

Axiaq admits that the information that his son passed along from Rivor was a factor in all of his Restoration Hardware purchases. When he received the tip from his son, Axiaq understood that merger announcements caused a stock's price to rise. Axiaq also understood that it was illegal to trade on inside information. Despite that knowledge, on Thursday, October 25, 2007, Axiaq began to purchase Restoration Hardware stock, which he had not previously traded. On October 25, 2007, Axiaq bought a total of 12,500 shares of Restoration Hardware stock spread over three separate trading accounts, spending over $37,000. Axiaq purchased 5,000 total shares in five separate purchases in his Ameritrade IRA account; 1,500 shares over two purchases in his E*trade Roth IRA account; and 5,000 shares in one purchase in his E*trade brokerage account. The purchase prices ranged from $2.89 to $3.06.

Besides the October 24, 2007 telephone conversation with his father, Emmanuel had other conversations with his father about the planned acquisition of Restoration Hardware. Axiaq sought more information about the acquisition and asked Emmanuel: "What's happening?" Emmanuel relayed additional information from Rivor to his father that the acquisition would "happen soon." Emmanuel told Axiaq that the planned acquisition price had increased. Emmanuel stated during a conversation with

Axiaq that Rivor was an employee of Restoration Hardware. These conversations between Axiaq and Emmanuel occurred on or before October 29, 2007, which is when Emmanuel transferred additional funds to Emmanuel's trading account so that Emmanuel could by more Restoration Hardware shares for himself.

On Monday, October 29, 2007, Axiaq visited a branch of TD Ameritrade Investments, where he had a traditional IRA brokerage account and an Amerivest IRA account. Axiaq had opened the Amerivest IRA account in March 2007. In September 2007, Axiaq told a TD Ameritrade representative, Mills, that he was happy with the performance of his Amerivest IRA account and would tell his wife to move her account to TD Ameritrade.

During his October 29th visit, however, Axiaq surprised Mills by stating that he wanted to liquidate his Amerivest IRA account, which was then valued at approximately $125,000. Axiaq told Mills that he wanted to transfer all of the funds into his TD Ameritrade traditional IRA account so that he could buy Restoration Hardware stock in his traditional IRA account. Axiaq told Mills that he had received a recommendation to purchase Restoration Hardware stock and that he thought he could do better by owning Restoration Hardware than what his Amerivest account had done to date.

Mills warned Axiaq that purchasing such a large amount of Restoration Hardware stock was inconsistent with the investor risk profile that Axiaq had described when he opened his Amerivest IRA account. Mills also warned Axiaq that he was increasing his risk. Mills was surprised by Axiaq's decision because Axiaq had told Mills when he opened the Amerivest IRA account in March 2007 that he did not want to have to pick his own stocks. Mills had the impression, however, that Axiaq had already made up his mind to liquidate the Amerivest IRA account.

Although liquidating his Amerivest IRA account to buy Restoration Hardware stock did not match the risk profile and goals he had outlined, Axiaq entered liquidation sales orders for all of his Amerivest shares on October 29, 2007. TD Ameritrade did not, however, complete the liquidation of those Amerivest shares and transfer the proceeds to Axiaq's traditional IRA brokerage account until Friday, November 2, 2007.

Meanwhile, during the week of Monday, October 29, 2007, through Friday, November 2, 2007, Axiaq bought an additional 115,000 shares of Restoration Hardware common stock for over

$340,000 as follows: 10,000 shares in his Vanguard account spread over 13 purchases on Monday; 10,000 shares in his Vanguard account spread over 23 purchases on Tuesday; 20,000 shares in his Vanguard account spread over 45 separate purchases and another 20,000 shares in his E*trade account spread over ten purchases on Wednesday; 10,000 shares in his Vanguard account spread over 17 purchases and 25,000 shares in his E*trade account spread over 21 purchases on Thursday; and 10,000 shares in his Vanguard account spread over 17 purchases and 10,000 shares in his E*trade account spread over 14 purchases on Friday. By the last day of that week, November 2, 2007, Axiaq's purchases of Restoration Hardware stock amounted to 29.10% of his brokerage accounts' total value.

In a conversation at his father's house during the weekend of November 3 and 4, 2007, Emmanuel learned that his father had purchased a large number of Restoration Hardware shares – well over the 10,000 share limit that Rivor instructed. Emmanuel was furious at Axiaq during the conversation for purchasing so many shares and risking exposure of their Restoration Hardware stock purchases. Axiaq admits that Rivor's employment at Restoration Hardware was discussed with Emmanuel during this conversation.

On Monday, November 5, 2007, Axiaq used all of the funds from the liquidation of his Amerivest account - nearly $125,000 - to purchase an additional 41,200 shares of Restoration Hardware. Axiaq purchased another 57,020 shares on Tuesday and 22,927 more shares on Wednesday, November 6-7, 2007, spending more than $215,000. In total, between October 25 and November 7, 2007, Axiaq purchased 248,649 shares of Restoration Hardware stock, spending a total of approximately $720,000. By the close of the markets on November 7, 2007, the value of Axiaq's purchases of Restoration Hardware stock represented 53.47% of his account holdings.

On November 8, 2007, Restoration Hardware issued a press release that it would be acquired by a private equity firm at $6.70 per share. The stock price, which had closed at $2.68 on November 7, 2008, more than doubled to close at $6.44 on November 8, 2007. The trading volume of 12,294,600 on November 8, 2007 was 55 times greater than the November 7, 2007 trading volume of 220,500. As a consequence, when the stock trading price closed at $6.44 per share that day, the value of Axiaq's holdings had increased by $881,102 from their purchase prices.

On November 13, 2007, Francis Axiaq sold 48,700 of his 248,649 shares at $6.50 and

$6.51 per share, and on May 12, 2008, Francis sold his remaining 199,949 shares.

On January 18, 2008, Commission staff contacted Axiaq by phone to interview him about his Restoration Hardware purchases. With Axiaq's permission, the interview was recorded. During that interview, Axiaq was asked if he knew about the acquisition before he bought any of his Restoration Hardware stock, to which he replied, "No. Oh, no." Axiaq stated that he first learned of the acquisition "[t]hrough the Internet, when I was checking in the morning. On a Thursday morning - I can remember the day - . . . Restoration Hardware wasn't trading, and then there was an article that there was an offer of 6.70 by the partnership or whatever it's called, and the stock went up a little bit." Axiaq characterized his response to the news as "so surprised."

When asked during the interview if he knew "anybody that has ever been employed" at Restoration Hardware, Axiaq identified a different individual, but did not identify Rivor as an employee that Axiaq knew. Axiaq was then asked three times if he knew anyone else that works at Restoration Hardware, and ultimately answered "Not that I know of."

On March 14, 2008, Axiaq provided sworn testimony to the Commission staff. During his sworn testimony Axiaq admitted that during the previous telephone interview, he concealed the tip he received from his son. During his sworn testimony, Axiaq also admitted that he knew that Rivor worked at Restoration Hardware at the time of the interview. Significantly, Axiaq testified that the information he received about the acquisition from Rivor through Emmanuel was a factor in his purchases of Restoration Hardware stock in October and November 2007.

## LEGAL ARGUMENT

I. **AXIAQ'S INSIDER TRADING VIOLATED SECTION 10(b) AND RULE 10b-5.**

Section 10(b) of the Exchange Act prohibits the use of any "deceptive device" in connection with the purchase or sale of a security. 15 U.S.C. § 78j(b). If a corporate insider buys or sells stock based upon material non-public information, the defendant violates Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. *United States v. O'Hagan*, 521 U.S. 642, 651, 117 S. Ct. 2199, 138 L. Ed. 2d 724 (1997); *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 851 (2d Cir. 1968).

Under the "classical theory" of insider trading liability, a corporate insider engages in deceptive and manipulative conduct by taking advantage of corporate information for a personal benefit,

rather than for its intended corporate purpose. *Dirks v. SEC*, 463 U.S. 646, 654, 103 S. Ct. 3255, 77 L. Ed 2d 911 (1983). That proscribed conduct also includes passing on material nonpublic corporate information to another individual or "tippee." *Id.* at 655. In that instance, the tippee inherits the tipper's fiduciary duty not to trade on the corporate information. *Id.* at 655-66.

The relevant case precedents and regulations therefore establish that Axiaq violated Section 10(b) and Rule 10b-5 if: (1) Rivor violated a fiduciary duty as a corporate insider by tipping information about the proposed acquisition of Restoration Hardware; (2) Axiaq knew or should have known that he received information about the proposed acquisition in violation of a breach of a fiduciary duty; (3) Axiaq acted with scienter by purchasing securities based upon the information and (4) the information Axiaq received was nonpublic and material. 17 C.F.R. § 240.10b5-1(a) (describing components of insider trading liability). *See Dirks, supra,* 463 U.S. at 660-64. As demonstrated below, Axiaq's prior admissions – as well as the evidence to be offered at trial – establish each of these elements in a conclusive fashion.

### A. Rivor Breached A Fiduciary Duty By Tipping Information To The Axiaqs.

At the time of the tip, Rivor was employed as Vice President of Treasury at Restoration Hardware. Rivor also signed an acknowledgment that he had "been given certain material non-public information" about the acquisition and was "required to maintain the confidentiality of such information." At the time of his tipping, Rivor was therefore a corporate insider who is liable under the classical theory. *Dirks, supra,* 463 U.S. 659-60; *United States v. Smith*, 155 F.3d 1051, 1053 (9th Cir. 1998) (corporate insider was a sales vice president); *SEC v. Falbo*, 14 F. Supp. 2d 508, 522-23 (S.D.N.Y. 1998) (employee "accepted a duty of confidentiality" when told she was being giving confidential merger information as part of the small "inner circle"); *SEC v. Soroosh*, 1997 WL 487434 (N.D. Cal. Aug. 5, 1997) ("no dispute" that a software engineer was a corporate insider).

A fiduciary breaches his duty if he tips another person with confidential information so that the other person can buy or sell securities based upon that information. *See Dirks, supra,* 463 U.S. at 662-64; *United States v. Willis*, 737 F. Supp. 269, 275 (S.D.N.Y. 1990). A fiduciary who provides the tip in exchange for a personal benefit or as a gift of confidential information to a trading relative or friend breaches his duty. *Dirks*, 463 U.S. at 662-64.

Rivor and Emmanuel were "good friends" and had been "trading buddies" previously. Rivor tipped the Axiaqs for the benefit of his own ego, to "be a nice guy," and to help them make a little money. Thus, in violation of Section 10(b) and Rule 10b-5, Rivor breached his fiduciary duty to Restoration Hardware – under the classical theory of liability – by providing the Axiaqs with confidential information about the acquisition of Restoration Hardware so that the Axiaqs could purchase Restoration Hardware stock. *Id.* The trial evidence will therefore establish the first element of Axiaq's liability.

### B. Axiaq Violated Section 10(b) And Rule 10b-5 By Using Information That He Knows, Or Should Know, Was Provided In Breach Of A Fiduciary Duty.

Axiaq violated Section 10(b) and Rule 10b-5 as a tippee when Rivor breached a fiduciary duty by tipping confidential information and when Axiaq *"knows or should know* that there has been a breach." *Dirks*, 463 U.S. at 660 (emphasis added). Once Axiaq knows or should know that he has received inside information in breach of a fiduciary duty, he inherits the tipper's duty not to trade on the information. *Id.*

Because a tippee may be liable if he "should know that there has been a breach" of a fiduciary duty, there is no requirement that Axiaq have actual knowledge of the breach or how it occurred. *See id. See also SEC v. Musella*, 748 F. Supp. 1028, 1038 & n.5 (S.D.N.Y. 1989) (ruling that tippees may be liable if they had reason to know that they possessed inside information because they were "on notice" to question the source of the information). Axiaq also did not need to know *how* the initial breach of fiduciary duty occurred or the fiduciary's identity. *SEC v. Thrasher*, 152 F. Supp. 2d 291, 229 n. 6, 304 (S.D.N.Y. 2001); *SEC v. Ferrero*, 1993 WL 625964, at *13 (S.D. Ind. Nov. 15, 1993), *aff'd* 51 F.3d 623 (7th Cir. 1995) ("Even if a tippee is one tippee in a chain of tippees, and had no direct contact with the original tipper, there is a violation [of Section 10(b)] if the tippee knew or had reason to know that he or she was trading on improperly obtained information.").

Axiaq understood the prohibition on inside trading at the time of his trades. He also understood that if information about an acquisition came from a corporate insider, it would be illegal to trade on that information. Axiaq furthermore knew that the information about the acquisition of Restoration Hardware came from Rivor before being passed on to him by Emmanuel. Axiaq's knowledge that Rivor was the source of the acquisition tip made Axiaq aware that Rivor was providing inside

information. Previously, with respect to the acquisition of the Good Guys, Rivor had tipped Axiaq with information about an upcoming acquisition and Axiaq knew at the time of the Good Guys tip that Rivor had disclosed information that Axiaq could not legally trade on. Given the prior history of Rivor's Good Guys tip, Axiaq necessarily knew that Rivor was engaging in similar misconduct by tipping him with inside information about Restoration Hardware. Accordingly, Axiaq knew or should have known that the information about the acquisition of Restoration Hardware had been provided to him in breach of a fiduciary duty.

The contents and character of Emmanuel's October 24th telephone call to Axiaq also prove that Axiaq knew or should have known that confidential information was being misused. Emmanuel told Axiaq to limit his purchases of Restoration Hardware stock to under 10,000 shares during that initial call, which demonstrates an intent to evade detection of wrongful conduct. Axiaq did not ask any questions about how Rivor would know (or did know) the information, or why the information would be reliable, indicating he was already aware of Rivor's employment. Axiaq's failure to ask these questions shows that Axiaq "did not ask because [he] did not want to know." *SEC v. Musella*, 678 F. Supp. 1060, 1063 (S.D.N.Y. 1988) (holding that "conscious avoidance of knowledge" does not "defeat[] scienter in a stock fraud case any more than it does in the typical mens rea criminal context").

Similarly, Axiaq's false statements to the Commission during his January 2008 telephonic interview also provide clear evidence that Axiaq knew that Rivor had breached a fiduciary duty by disclosing information about the acquisition to Emmanuel and Axiaq on October 24th. During the interview, Axiaq concealed the communications with Rivor by claiming that he was surprised to hear about the acquisition on November 8, 2007 and by failing to identify Rivor as a Restoration Hardware employee that he knew at the time of the interview. Axiaq's false statements during the interview prove Axiaq's consciousness of guilt with respect to the character of the information that he received from Rivor, as well as of Axiaq's use of that information to purchase Restoration Hardware stock. *SEC v. Cassano, supra*, 61 F. Supp. 2d at 34. The evidence supports the second element of Axiaq's liability.

### C.    Axiaq Knowingly Used Material Non-Public Information To Buy Stock.

Violations of Section 10(b) and Rule 10b-5 require an "intent to defraud." *Aaron v. SEC*, 446 U.S. 680, 695 (1980). In the Ninth Circuit, evidence of recklessness is sufficient to show intent to

defraud. *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 856 (9th Cir. 2001) (citing *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-69 (9th Cir. 1990)). More significantly, a defendant who trades "on the basis of material nonpublic information" has acted with scienter. *United States v. Smith, supra*, 155 F.3d at 1069. Trading on the basis of material nonpublic information exists if the trader was aware of the information at the time of the purchase or sale. 17 C.F.R. § 240.10b5-1(b) (defining "on the basis"); *SEC v. Ginsburg*, 362 F.3d 1292, 1297-98 (11th Cir. 2004).

By Axiaq's own admissions, he knew about – and therefore traded upon – the information that Axiaq received from Rivor – through Emmanuel – about a planned acquisition of Restoration Hardware. On multiple occasions during his investigative testimony, Axiaq admitted that the information about the proposed acquisition was a "factor" in his stock purchases. As a result, Axiaq admits that his trades used confidential information about the acquisition. Additionally, Axiaq admits that he knew that information about a merger would cause the stock price to rise, but that it is improper to use inside information to purchase stock. Despite knowing that using information about a merger is improper, Axiaq nonetheless bought Restoration Hardware stock while information about the acquisition as a factor in his trading. The third element of scienter is therefore satisfied in this case.

The fourth requirement – Axiaq's receipt of information that is material and non-public – is also satisfied here. Information about potential mergers or acquisitions is material for shareholders of the target company. *SEC v. Ingram*, 694 F. Supp. 1437, 1441 (C.D. Cal. 1988) (recognizing that the acquisition of a company is "the most important event that can occur" in the life of a corporation). Additionally, "where information regarding a merger originates from an insider, the information, even if not detailed, takes on an added charge just because it is inside information." *SEC v. Mayhew*, 121 F.3d 44, 52 (2d Cir. 1997) (quoting *SEC v. Geon Industries, Inc.*, 531 F.2d 39, 47 (2d Cir. 1976).

Under Section 10(b) and Rule 10b-5, information remains "nonpublic" until either: (1) the information is "disclosed to achieve a broad dissemination to the investing public generally and without favoring any special person or group," or (2) "although known only by a few persons, their trading on it has caused the information to be fully impounded into the price of the particular stock." *SEC v. Mayhew, supra*, 121 F.3d at 50 (quoting *Dirks*, 463 U.S. at 653, and *United States v. Libera*, 989 F.2d 596, 601 (2d Cir. 1993)). The material and non-public character of information may be demonstrated by an increase

in trading volume and price of the stock following public dissemination of the information. *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989) (dramatic price movements in response to a statement about a company are a strong indication that the statement was material).

It is undisputed that prior to the opening of the market on November 8, 2007, Restoration Hardware issued a press release announcing the acquisition at $6.70 per share. The stock price, which had closed at $2.68 on November 7, 2008, more than doubled to close at $6.44 on November 8, 2007. The trading volume of 12,294,600 on November 8, 2007 was 55 times greater than the November 7, 2007 trading volume of 220,500. The dramatic stock price increase on November 8, 2007, in response to the public announcement, establishes that the announcement provided the markets with previously unknown and material information regarding Restoration Hardware. As a result, Axiaq possessed material non-public information about the acquisition before the November 8th public announcement.

Axiaq's enormous purchases of Restoration Hardware stock between October 25, 2007 and November 7, 2007 provide additional proof that Axiaq's trading was based upon the material nonpublic information about a proposed acquisition of the company. *Smith*, 155 F.3d at 1069 (Government would have "little trouble" showing use where "an individual who has never before invested comes into possession of material non-public information and the very next day invests a significant sum of money in substantially out-of-the-money call options."); *Ginsburg*, 362 F.3d at 1299 ("The larger and more profitable the trades, and the closer in time the trader's exposure to the insider, the stronger the inference that the trader was acting on the basis of inside information."). Axiaq's pattern of Restoration Hardware stock purchases after the October 24th telephone call from Emmanuel supports a determination that nonpublic material information has been received, and is being used, by Axiaq. *SEC v. Adler, supra*, 137 F.3d at 1340, 1343 (timing of trades and telephone calls); *SEC v. Maio*, 51 F.3d 623, 637 (7th Cir. 1995) (ruling that trading soon after news is received indicates the materiality); *SEC v. Downe, supra*, 969 F. Supp. at 154-55 (timing of events, conversations and trades).

II. **THE COURT SHOULD IMPOSE REMEDIAL RELIEF UPON AXIAQ.**

A. **Axiaq Should Disgorge His November 8, 2007 Stock Price Gains.**

As demonstrate above and at trial, Axiaq violated Section 10(b) and Rule 10b-5 by purchasing Restoration Hardware stock based upon inside information. By virtue of his violations, Axiaq

should disgorge his ill-gotten gains from the purchase of Restoration Hardware shares between October 25, 2007 and November 7, 2007. Disgorgement helps deter securities violations by depriving a wrongdoer of the benefit of his violations. *See SEC v. First Pacific Bankcorp.*, 142 F.3d 1186, 1191-92 (9th Cir. 1998) (describing nature of disgorgement remedy). It also serves as a source of compensation for defrauded investors. As related relief, Axiaq's payment of prejudgment interest on the ill-gotten gains from November 8, 2007 will deprive him of the time value of those gains. *See Knapp v. Whinney*, 90 F.3d 1431, 1441 (9th Cir. 1996) (describing court's equitable discretion to award prejudgment interest).

To be adopted by the Court, the Commission's disgorgement formula only has to be a reasonable approximation of the profits causally connected to the violation. *SEC v. Patel*, 61 F.3d 137, 139 (2d Cir. 1995); *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989). Any "'risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty.'" *Patel*, 61 F.3d at 140 (quoting *First City Fin. Corp.*, 890 F.2d at 1232).

The standard measure of disgorgement for purchasing stock based upon inside information is the difference between the price paid for the shares and the price of the shares shortly after the inside information has been publicly disclosed. *Id.* at 139-40 (citing *SEC v. Texas Gulf Sulphur*, 446 F.2d 1301, 1308 (2d Cir. 1971)). Consistent with the standard measure of disgorgement, the Commission calculates Axiaq's disgorgement amount by subtracting his acquisition costs for his Restoration Hardware shares from the value of those shares when the market closed on November 8, 2007, the day of the announcement. Using that formula, the Commission calculates Axiaq's principal amount of disgorgement as being $881,102.

### B. Civil Penalties Will Deter Similar Misconduct By Axiaq And Others.

Under Section 21A of the Exchange Act, the Court may impose a civil monetary penalty against insider traders which "shall be determined by the court in light of the facts and circumstances, but shall not exceed three times the profit gained or loss avoided as a result of such unlawful purchase or sale . . . ." 15 U.S.C. § 78u-1(a)(2). Treble penalties for insider trading protect the securities markets by creating a stronger enforcement – and therefore deterrent – mechanism.

According to House Report 98-355:

The United States securities markets are liquid, efficient and fair.

>The prices of the vast majority of actively traded securities reflect available public information about companies and the economy. Capital formation and our nation's economic growth and stability depend on investor confidence in the fairness and integrity of our capital markets.
>
>Insider trading threatens these markets by undermining the public's expectations of honest and fair securities markets where all participants play by the same rules. *This legislation provides increased sanctions against insider trading in order to increase deterrence of violations.*

H.R. Rep. No. 355 at 2 (emphasis added).

Congress authorized Commission actions seeking treble penalties because other relief, such as injunctions and disgorgement, were inadequate given the huge illegal profits that tempt insiders:

>Although an injunction subjects a defendant to possible criminal contempt proceedings if he violates the law again, the injunction itself serves only a remedial function and does not penalize a defendant for the illegal conduct. Disgorgement of illegal profits has been criticized as an insufficient deterrent, because it merely restores a defendant to his original position without extracting a real penalty for his illegal behavior. The risk of incurring such penalties often fails to outweigh the temptation to convert nonpublic information into enormous profits.

*Id.* at 7-8. A civil penalty is therefore necessary in this case, and all other insider trading cases, to deter both the past wrongdoer and potential future wrongdoers from trading on inside information.

Axiaq's misconduct justifies the imposition of a large civil penalty. His conduct was egregious; even though he knew that insider trading was illegal, Axiaq placed over 50% of his account assets into Restoration Hardware stock just before the acquisition announcement, and saw an $881,102 profit on the day of the announcement. When contacted about his trading by the Commission staff, Axiaq obstructed the investigation into his trading by lying about his prior knowledge of the acquisition and his relationship with Rivor at Restoration Hardware.

Axiaq also refuses to acknowledge his wrongdoing, and instead makes the untrue and non-credible claim that his enormous stock purchases were based on mere rumors and an internet posting. Axiaq's refusal to acknowledge wrongdoing stands in stark contrast to Rivor and Emmanuel, who settled early and who, in the case of Emmanuel, paid a civil penalty equal to the amount of his personal profits.

### C. A Permanent Injunction Is Necessary Given Axiaq's Lack Of Remorse.

Section 20 of the Exchange Act authorizes the Court to enjoin Axiaq from further violations of Section 10(b) and Rule 10b-5. 15 U.S.C. § 78u(d)(1) & 15 U.S.C. § 78u(e). To obtain a

permanent injunction, the Commission is required to show a reasonable likelihood that the defendant will commit future violations. *SEC v. Fehn*, 97 F.3d 1276, 1295 (9th Cir. 1996).

In determining whether to impose a permanent injunction against Axiaq, the Court should consider the totality of the circumstances, including such factors as (1) the degree of scienter involved, (2) the isolated or recurrent nature of the infraction, (3) Axiaq's recognition of the wrongful nature of his conduct; (4) the likelihood, because of defendant's professional occupation, that future violations might occur; (5) and the sincerity of his assurances against future violations." *Fehn*, 97 F.3d at 1295-96; *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980).

A permanent injunction is necessary to prevent future violations in light of Axiaq's decision to engage in insider trading despite his knowledge that such trading was improper. This demonstrates a high level of scienter. Axiaq's refusal to acknowledge the wrongful nature of his illegal conduct and conscious decision to make affirmative misrepresentations to government regulators in an attempt to conceal his misconduct also demonstrates a complete lack of remorse. Indeed, Axiaq is so self-centered and greedy that he went on a buying binge of Restoration Hardware shares on November 5, 6 and 7, 2007 even after his son, Emmanuel, had quarreled with him for potentially exposing their trading through Axiaq's large stock purchases. These considerations demonstrate that unless enjoined, Axiaq is likely to engage in similar illegal activity.

## CONCLUSION

Based upon the trial evidence, the Court should find Axiaq liable for insider trading in violation of Section 10(b) and Rule 10b-5 of the Exchange Act and should impose remedies in the form of disgorgement, civil penalties and a permanent injunction.

DATED:   September 17, 2009

Respectfully submitted,

Marc J. Fagel
John S. Yun
Mark P. Fickes
Cameron P. Hoffman
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION